UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE EXTRADITION OF:<br><br>JOSE LUCAS VELASQUEZ PEDROZA | Case No.:  19mj1696-RBB<br><br>**FINDINGS OF FACT, CERTIFICATION OF EXTRADITABILITY, AND ORDER OF COMMITMENT** |

This is a proceeding under 18 U.S.C. § 1384 pursuant to a request by the Republic of Finland, through the United States of America, for the extradition of Jose Lucas Velasquez Pedroza ("Velasquez Pedroza"), a citizen of the Republic of Guatemala, from the United States to Finland.  The extradition request was made under the provisions of the Extradition Treaty Between the United States of America and Finland signed June 11, 1976, as amended by the Protocol to the Extradition Treaty between the United States of America and Finland signed June 11, 1976, with Annex, signed December 16, 2004, for crimes Velasquez Pedroza is alleged to have committed in Finland.  The matter proceeded to an extradition hearing on January 21, 2020.  The interests of Finland were represented by the United States through the United States Department of Justice and

/ / /

/ / /

Assistant United States Attorney Francis A. DiGiacco.  Velasquez Pedroza appeared at the hearing and was represented by attorney Benjamin P. Lechman.

The Court, for the reasons explained below, finds Velasquez Pedroza extraditable.

# I.    BACKGROUND

## A.    Procedural History

On July 13, 2018, a warrant for the detention of Velasquez Pedroza was issued by the Helsinki District Court in criminal case numbers R 18/4889 and R 17/8841.  (Crim. Compl. Attach. #1 Ex. 1 [warrant], at 39-41, ECF No. 1.)  On February 26, 2019, Finland submitted a request to the United States for Velasquez Pedroza's extradition.  (Id. [extradition req.], at 8-12.)  On April 25, 2019, the United States, on behalf of Finland, filed a Criminal Complaint against Velasquez Pedroza requesting the issuance of an arrest warrant and a finding of extraditability.  (Crim. Compl. 1-5, ECF No. 1.)  Velasquez Pedroza was arrested on April 26, 2019, and appeared before Magistrate Judge Mitchell D. Dembin that same day [ECF Nos. 4, 6.]

On August 23, 2019, the United States filed a Memorandum of Law in Support of Finland's Request for Extradition [ECF No. 14].  On October 24, 2019, Velasquez Pedroza filed an opposition (captioned as a "reply") to the extradition request [ECF No. 18].  The United States filed a reply on November 7, 2019 [ECF No. 19].  The parties appeared before the Court on December 3, 2019, the date initially set for the extradition hearing, but the hearing did not go forward as Velasquez Pedroza requested a continuance.  (Hr'g Tr. 2, Dec. 3, 2019, ECF No. 23.)  His counsel explained that Velasquez Pedroza, who was present at the hearing, "was initially prosecuted in streamline for a 1325, he pleaded guilty, was released, but  . . . prior to his release ha[d] filed an asylum application contesting his return to Guatemala."  (Id.)[1]  He requested an

---

[1] "Streamline" refers to the process used by the Department of Justice to manage prosecution of misdemeanor charges brought under 8 U.S.C. § 1325 for illegal entry into the United States.  See United States v. Chavez-Diaz, Case No.: 18mj20098 AJB, 2018 WL 9543024, at *1-2 (S.D. Cal. Oct. 30, 2018)

opportunity to submit supplemental briefing regarding the effect of his asylum claim on these extradition proceedings.  (Id. at 3.)  The Court granted the request for a continuance, issued a supplemental briefing schedule, and reset the hearing [ECF No. 20].  Velasquez Pedroza filed a supplemental brief on December 16, 2019 [ECF No. 21].  The United States filed its response on January 3, 2020 [ECF No. 22].  The Court held an extradition hearing on January 21, 2020 [ECF No. 24].

**B.    The Request for Extradition**

Finland seeks to extradite Velasquez Pedroza to be prosecuted for one count of sexual abuse of a child and one count of rape, committed in Finland on April 30, 2016 and February 10-11, 2017, respectively.  (Crim. Compl. Attach. #1 Ex. 1 [extradition req.], at 8, ECF No. 1.)  Included as part of the extradition request is a description of facts provided by the Helsinki Prosecutor's Office.  (Id. at 9-12.)

**1.    Sexual abuse of a child charge**

The facts with respect to the sexual abuse of a child charge were summarized by the District Prosecutor as follows:

> On the evening of 30 April 2016, [HH],[2] then 14-years-old (dob 26 December 2001), went to a park in Helsinki with her girlfriend [EH].  Between 10:15 and 10:45 p.m., while they sat talking on a park bench, Velasquez Pedroza and a companion, Emilio Acuña Luna, walked up to their bench, sat down, and started talking to them.  Luna had a bottle of red wine which he offered to share with the girls.  Velasquez Pedroza and Luna also told them that they were each 19-years-old and that Velasquez Pedroza was from Mexico and Luna from Argentina.
>
> During the interaction which ensued, Velasquez Pedroza focused his attention on [HH] and Luna on [EH].  Velasquez Pedroza gave [HH] his cell phone number (050 917 9004) and she also took a photograph of him with her cell phone.  At some point, against her will, Velasquez Pedroza grabbed

---

(describing the Department of Justice's "Operation Streamline" process as implemented by the United States in this district).

[2] Because this matter involves a minor, the Court uses only the minor's initials throughout this order.  See Fed. R. Civ. P. 5.2(a)(3).

the back of [HH's] head with one hand and started to kiss her in her mouth with his tongue, and with the other hand, over her clothing, fondled her breasts and buttocks. When this occurred, [HH] asked for help, and a woman who was walking by started screaming at Velasquez Pedroza and Luna, resulting in their rapid departure.

On 2 May 2016, [HH]'s father reported the incident to the Finnish police. Because Velasquez Pedroza had given [HH] his cell phone number, the police were able to track him and question him on 8 June 2016. A DNA sample also was taken from Velasquez Pedroza when he was interviewed.

Velasquez Pedroza admitted picking up Luna from the park the night in question, but denied any involvement with [HH]. According to Velasquez Pedroza, Luna, who was highly intoxicated, was surrounded by a group of girls. When some of the girls started making hostile and provocative comments, he grabbed Luna by one of his wrists, escorted him to his (Velasquez Pedroza's) car, and drove away.

On 19 January 2019, [HH] identified the photograph of Velasquez Pedroza attached at Tab 2 of this report as that of the person who sexually abused her on 30 April 2016. (footnote omitted)

(Id. at 10.)

## 2. Rape charge

The District Prosecutor's description of facts relating to the rape charge is as follows:

On the evening of 10 February 2017, Susanna Korpela and her girlfriend Maria Carlander, visited friends and each consumed a couple of glasses of wine. From there, Korpela and Carlander stopped by Vlatava, a restaurant in downtown Helsinki near a train station. At the restaurant they each had a glass of wine and ordered a bottle of wine to share.

Korpela next remembers that in the early morning hours of 11 February 2017, she woke up completely naked on the floor of a dressing room of a restaurant. The restaurant was approximately 300 to 400 meters from Vlatava in the same block as the Helsinki University Unicafe. Her clothes were strewn on the floor. There was a foreign man in the room unknown to Korpela. He told her that his name was Luca, that they had had sex, and that he had saved her at the railway station when several Russians

4

tried to take her somewhere. While Korpela had no recollection of having sex with the man, she had a sensation in her vagina that sex had taken place. After getting dressed, Korpela walked out of the building, exiting it near a subway station close to the University of Helsinki. The shops were open and she arrived home around noon.

Once at home, Korpela contacted Carlander via Facebook and advised her of what had happened. Carlander in turn notified Ville Ketola (an on-and-off boyfriend of Korpela's) about her Facebook message and he went to see her. In tears, Korpela told Ketola that she had been raped. Korpela recounted that after patronizing Vlatava the evening before, she had a vague recollection of being followed by a group of men (possibly foreigners) outside the restaurant, and then waking up naked in the company of an unknown man who had told her they had had sexual intercourse. Ketola then called the police who sent a patrol unit to Korpela's home.

After interviewing Korpela, the police took her to a forensic pathologist who medically examined her and took specimens from her vagina for spermatozoa and DNA testing. A breathalyzer test performed at 9:05 p.m. that evening showed a reading of .44%. (0.195 mg/L). A copy of the certificate of examination is appended to this report at Tab 3.

On 11 April 2017, the specimens were submitted to Y-chromosome classification at the National Bureau of Investigations Forensic Laboratory. A type Y chromosome was found in the specimen secured from Korpela. The DNA sample obtained from Velasquez Pedroza on 8 June 2016 when he was questioned about the sexual assault of [HH] also contained a Y-chromosome type matching the one from Korpela's specimen. The Y-chromosome type in question corresponds to 0.6% of the Finnish male population. A copy of the laboratory report is appended at Tab 4.

After the rape, Korpela received three WhatsApp messages from Velasquez Pedroza's cell phone number (050 917 9004). The first message on 18 February 2017 stated: "Susanna!!! T. Lukas XD"; the second on 24 June 2017 read: "Dedicada a mis amigos de todo el mundo uno pasa ala par del amo<3"; and the last on 25 July 2017 stated: "Moi! Mitä kuuluu?" (translated into English as "Hi, how ya doin?"). Korpela did not answer any of these messages.

On 22 January 2018, Velasquez Pedroza was questioned by Finnish law enforcement authorities about Korpela's allegations. While he had been

formally charged by then in the sexual abuse case (that had taken place on 17 October 2017), the officials who questioned Velasquez Pedroza were not aware that a charge had been filed against him in connection with that incident.

During the interview, Velasquez Pedroza stated that he did not remember what he had done the evening of 10 February 2017 or know anyone by the name of Susanna Korpela, and that he had not sent any WhatsApp messages to unknown women. Velasquez Pedroza added that he had spent the weekend of 11 and 12 February 2017 with his girlfriend, and that during the eleven years he had resided in Finland, he had never changed his cell phone number. Lastly, Velasquez Pedroza stated that he had been employed for approximately one year at the Helsinki University Cafe.

On 21 January 2019, Korpela identified the photograph of Velasquez Pedroza attached at Tab 2 of this report as that of the person who raped her on 11 February 2017.

(Id. at 11-12.)

Velasquez Pedroza has been charged with sexual abuse of a child in violation of Chapter 20, Section 6 of the Finnish Criminal Code and with rape in violation of Finnish Criminal Code Chapter 20, Section 1. (Id. at 8.)

## II.  LEGAL STANDARDS

### A.  General Principles

Extradition from the United States is a diplomatic process that is initiated when a foreign nation requests extradition of an individual from the Department of State. Prasoprat v. Benov, 421 F.3d 1009, 1012 (9th Cir. 2005); Manta v. Chertoff, 518 F.3d 1134, 1140 (9th Cir. 2008). "After the request has been evaluated by the State Department to determine whether it is within the scope of the relevant extradition treaty, a United States Attorney . . . files a complaint in federal district court seeking an arrest warrant for the person sought to be extradited." Blaxland v. Commonwealth Dir. of Pub. Prosecutions, 323 F.3d 1198, 1207 (9th Cir. 2003). "A judge or magistrate judge must then hold an extradition hearing to determine if the evidence is sufficient to sustain the charge of extradition under the relevant treaty." Manta, 518 F.3d at 1140 (citation

omitted); see also 18 U.S.C. § 3184. "Extradition treaties are to be liberally construed so as to effect their purpose, that is, to surrender fugitives for trial for their alleged offenses." In re Extradition of Santos, 795 F. Supp. 2d 966, 970 (C.D. Cal. 2011) (citing Valentine v. United States ex rel. Neidecker, 299 U.S. 5, 14 (1936)).

The authority of a magistrate judge serving as an extradition judicial officer is limited to determining an individual's eligibility to be extradited, which is done by ascertaining (1) whether the crime is an extraditable offense under the subject treaty and (2) whether probable cause exists to sustain the charge. Vo v. Benov, 447 F.3d 1235, 1237 (9th Cir. 2006). If the judge determines that these requisite elements have been met, the findings are incorporated into a certificate of extraditability to the Department of State. Id. The Secretary of State makes the ultimate decision on whether to surrender the individual to the requesting country. 18 U.S.C. § 3186.

## B.    The Extradition Hearing

"An extradition proceeding is not a trial[.]" Emami v. United States Dist. Court, 834 F.2d 1444, 1452 (9th Cir. 1987). "The only purpose of the extradition hearing is for the magistrate judge to determine whether the crime is extraditable and whether there is probable cause to support the charge." Prasoprat, 421 F.3d at 1014 (citation omitted). Thus, "discovery in an international extradition hearing is limited and lies within the discretion of the magistrate [judge]." In re Extradition of Kraiselburd, 786 F.2d 1395, 1399 (9th Cir. 1986). A fugitive's right to present evidence at the extradition hearing is severely limited. He or she may only present evidence that explains rather than contradicts the demanding country's proof. Hooker v. Klein, 573 F.2d 1360, 1368 (9th Cir. 1978). The extent to which a fugitive may offer explanatory proof is largely within the discretion of the court. Id. at 1369. "While the line between 'contradictory' and 'explanatory' evidence is not sharply drawn, the purpose of permitting explanatory evidence is to afford the relator 'the opportunity to present reasonably clear-cut proof which would be of limited scope and have some reasonable chance of negating a showing

of probable cause.'" Koskotas v. Roche, 931 F.2d 169, 175 (1st Cir. 1991) (citation omitted).

Evidence of facts contradicting the demanding country's proof or establishing a defense is properly excluded. Hooker, 573 F.2d at 1369. An extradition court may therefore properly exclude evidence of alibi, of facts contradicting the government's proof, or of a defense such as insanity or self-defense. Id. at 1368 (citations omitted). The fugitive has no right to cross-examine witnesses in an extradition proceeding. Oen Yin-Choy v. Robinson, 858 F.2d 1400, 1406 (9th Cir. 1988). The Court's role is "not [to] weigh conflicting evidence and make factual determinations but, rather, [to] determine[] only whether there is competent evidence to support the belief that the accused has committed the charged offense." Quinn v. Robinson, 783 F.2d 776, 815 (9th Cir. 1986). "Because of the limited function of an extradition proceeding and the limited participation permitted of the fugitive, the order of the court does not reflect a consideration of all the merits of the case." Hooker, 573 F.2d at 1368.

## III.    DISCUSSION

As set forth above, an extradition judicial officer is limited to determining an individual's eligibility to be extradited by ascertaining (1) whether the crime is an extraditable offense under the subject treaty and (2) whether probable cause exists to sustain the charge. Vo, 447 F.3d at 1237. Before turning to these issues, the Court addresses Velasquez Pedroza's argument, raised in his supplemental briefing, that his request for asylum precludes extradition.

A.    **Velasquez Pedroza's Pending Asylum Claim and These Proceedings**

Velasquez Pedroza states that he applied for asylum last year and was interviewed by an asylum officer on April 12, 2019. (Def.'s Supp. Br. 2, ECF No. 21.) It is his understanding that "the decision regarding credible fear is currently pending." (Id.) He argues that extradition to Finland and ultimate return to "his home country of Guatemala" would violate the Refugee Act's non-refouler provision and the 1967 United Nations Protocol Relating to the Status of Refugees, and thus the Court "should deny the

[G]overnment's extradition request unless and until [his] asylum request is denied." (Id. at 7-9.) The United States contends that Velasquez Pedroza's asylum request has no bearing on these extradition proceedings and that its extradition request should proceed. (United States' Supp. Br. 3-6, ECF No. 22.)

Asylum applications are governed by 8 U.S.C.A. § 1158 (West 2017). Any alien who is physically present in the United States may apply for asylum, regardless of his immigration status. See id. § 1158(a)(1). Asylum may be granted to an alien who qualifies as a "refugee." Id. § 1158(b)(1)(A). A "refugee" is defined as an alien who is unwilling or unable to return to his country of nationality due to "persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion[.]" 8 U.S.C.A. § 1101(a)(42)(A) (West 2017).

In enacting the Refugee Act of 1980, Congress sought to bring United States refugee law into conformity with the 1967 United Nations Protocol Relating to the Status of Refugees ("1967 Protocol"), Jan. 31, 1967, 19 U.S.T. 6223, to which the United States acceded in 1968. See Barapind v. Reno, 225 F.3d 1100, 1106 (9th Cir. 2000). The 1967 Protocol incorporates the substantive provisions of the 1951 United Nations Convention Relating to the Status of Refugees ("Refugee Convention"), July 28, 1951, 19 U.S.T. 6223. Id. Article 33.1 of the Refugee Convention provides: "No Contracting State shall expel or return ("refouler") a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion." Id. "[T]he Protocol was not intended to be self-executing, and serves only as a useful guide in determining congressional intent in enacting the Refugee Act." Barapind, 225 F.3d at 1107 (citations omitted). The Refugee Act, codified at 8 U.S.C.A. §§ 1157-59, provides in pertinent part: "In the case of an alien granted asylum under subsection (b), the Attorney General . . . shall not remove or return the alien to the alien's country of nationality or, in the case of a person having no nationality, the country of the alien's last

9

habitual residence . . . ." 8 U.S.C.A. § 1158(c)(1)(A). Velasquez Pedroza contends that section 1158 is "absolute in its mandate that asylants shall not be returned to their country of nationality." (Def.'s Supp. Br. 7, ECF No. 21.) Although he concedes that the United States, in this proceeding, is seeking to extradite him to Finland, not Guatemala, he speculates that the practical effect of extradition will be to "bypass asylum and ultimately deprive [him] of the protection of asylum and place him ultimately back in Guatemala." (Id. at 8.)

Velasquez Pedroza relies on Castañeda-Castillo v. Holder, 638 F.3d 354 (1st Cir. 2011), to support his argument that his request for asylum precludes extradition. In that case, the United States sought to hold Castañeda's asylum case in abeyance pending the resolution of extradition proceedings, the reverse of the circumstances at issue in this case, in which Velasquez Pedroza seeks to hold extradition proceedings in abeyance pending resolution of asylum proceedings. The First Circuit denied the United States' request, finding that Castañeda's asylum claims, which had been pending for eighteen years and affected his wife and daughters as beneficiaries, should be considered on the merits without further delay. Id. at 361-62. The court disagreed that adjudicating the asylum claims would complicate or interfere with the extradition proceedings, observing that "asylum and extradition proceedings are separate and distinct in the sense that the resolution of even a common issue in one proceeding is not binding in the other." Id. at 360 (internal quotations omitted). The court continued, "[A]lthough asylum and extradition proceedings are related insofar as they both bear on whether Castañeda will ultimately be forced to return to Perú, they are rooted in distinct sources of law, governed by procedures specified in distinct statutory regimes, and responsive to different sets of policy concerns." Id. at 361. Here, Velasquez Pedroza seeks to have extradition proceedings against him held in abeyance or dismissed pending resolution of his asylum case, which again is the flip of the issue considered by the circuit court in Castañeda-Castillo. While the First Circuit found, under the "specific and compelling" circumstances present in Castañeda-Castillo, that asylum claims should proceed prior to

resolution of the extradition proceedings, the court did not hold that extradition proceedings could not proceed until the asylum claims were resolved. In fact, the First Circuit recognized that asylum and extradition proceedings are "separate and distinct" and that extradition of an individual may be ordered by the Secretary of State even if that individual is granted asylum by immigration authorities. Id. at 360-61. Castañeda-Castillo, therefore, does not provide support for Velasquez Pedroza's request to dismiss the extradition proceedings against him or to hold them in abeyance pending resolution of his asylum case.

Moreover, Velasquez Pedroza has not demonstrated that either the Refugee Act, 8 U.S.C.A. § 1158, or Article 33 of the Refugee Convention are implicated here. These extradition proceedings do not seek to return Velasquez Pedroza to his country of nationality, Guatemala, but rather to Finland. Section 1158 only addresses removing or returning a refugee to his country of nationality. See 8 U.S.C.A. § 1158(c)(1)(A). Additionally, section 1158 only applies to refugees who have been granted asylum. See id. Therefore section 1158, by its express terms, does not apply. Velasquez Pedroza has also not shown that his life or freedom would be threatened in Finland due to "his race, religion, nationality, membership of a particular social group or political opinion." See Refugee Convention, 19 U.S.T. 6223, art. 33.1. Rather, he is to be extradited to Finland to face criminal charges. The argument that extradition to Finland would undermine his asylum claims and ultimately result in his return to Guatemala is speculative and not adequately supported by any argument or authority.

The Court finds that Velasquez Pedroza's pending asylum claim does not forestall these extradition proceedings.

## B. Determination of Whether the Offenses are Extraditable

To determine whether the subject crime is an extraditable offense, the Court must find that an extradition treaty exists between the United States and Finland, and that the crime charged is covered by the treaty. Id. (citing 18 U.S.C. § 3184).

/ / /

## 1. Existence of treaty

The United States has submitted a declaration from Elise M. Liadis, Attorney Adviser for the Office of the Legal Adviser for the Department of State, Washington, D.C., dated March 7, 2019, which verifies that the Extradition Treaty between the United States of America and Finland, signed June 11, 1976 (the "1976 Treaty"), and the Protocol to the Extradition Treaty between the United States of America and Finland, signed June 11, 1976 (the "Protocol"), with Annex, signed December 16, 2004, are presently in full force and effect. (Crim. Compl. Attach. #1 Ex. 1 [Liadis Decl.], at 4, ECF No. 1.) A copy of the 1976 Treaty and the Protocol and Annex are attached to the declaration. (See id. [treaty & treaty protocol], at 13-38.) Ms. Liadis's statement on this matter is entitled to deference. See Matter of Extradition of Mainero, 990 F. Supp. 1208, 1216 (S.D. Cal. 1997) (finding that State Department's opinion on force and effect of treaty is entitled to deference). Moreover, Velasquez Pedroza does not contest the existence of the treaty. The Court finds that an extradition treaty exists between the United States and Finland.

## 2. Coverage of crimes by treaty

Ms. Liadis attests that the offenses for which extradition is requested, sexual abuse of a child and rape, are covered by Article 2 of the 1976 Treaty, as replaced by Article 1 of the Protocol and Annex. (Crim. Compl. Attach. #1 Ex. 1 [Liadis Decl.], at 6, ECF No. 1.) Article 1 of the Protocol and Annex states: "An offense shall be an extraditable offense if it is punishable under the laws of the requested and requesting States by deprivation of liberty for a maximum period of more than one year or by a more severe penalty." (Id. [treaty protocol], at 35.) As above, Ms. Liadis's opinion is entitled to deference. See Kolovrat v. Oregon, 366 U.S. 187, 194 (1961) (stating that opinion of responsible government agency on meaning given to treaty is given great weight); see also Mainero, 990 F. Supp. at 1216.

Furthermore, it is evident that the crimes charged are covered by the terms of the treaty because they are punishable under the laws of Finland and the United States by

deprivation of liberty for a maximum period of more than one year. Sexual abuse of a child is punishable under the Criminal Code of Finland, Chapter 20, Section 6 as follows:

> (1) A person who by touching or otherwise performs a sexual act on a child below the age of sixteen years, said act being conducive to impairing his or her development, or induces him or her to perform such an act, shall be sentenced for sexual abuse of a child to imprisonment for at least four months and at most four years.

(See Crim. Compl. Attach. #1 Ex. 1 [statutes], at 59, ECF No. 1.) Rape is also punishable under Finnish law for a maximum period of more than one year. Criminal Code of Finland, Chapter 20, Section 1 provides:

> (1) A person who forces another into sexual intercourse by the use or threat of violence directed against the person shall be sentenced for rape to imprisonment for at least one year and at most six years.

> (2) Also a person who, by taking advantage of the fact that another person, due to unconsciousness, illness, disability, state of fear or other state of helplessness, is unable to defend himself or herself or to formulate or express his or her will, has sexual intercourse with him or her, shall be sentenced for rape.

(Id.) Therefore, both crimes charged are punishable in Finland by a maximum imprisonment of more than one year, as required by Article 1 of the Protocol and Annex.

The Court must next determine whether the crimes charged are punishable in the United States by a maximum imprisonment of more than one year. In reviewing whether the conduct is punishable under the "laws of the requested State," (see id. [treaty protocol], at 35), that is, the United States, the Court may look to both state and federal law. See Wright v. Henkel, 190 U.S. 40, 58-59, 61 (1903) (interpreting treaty requiring that offense be "made criminal by the laws of both countries" to include state law); Hu Yau-Leung v. Soscia, 649 F.2d 914, 918 (2nd Cir. 1981), cert. denied, 454 U.S. 971 (1981) (stating the phrase "under the law of the United States of America" in an extradition treaty "must be taken as including both state and federal law absent evidence

that it was intended to the contrary"); <u>Peters v. Egnor</u>, 888 F.2d 713, 719 (10th Cir. 1989) (finding both federal and state law applicable when treaty requires that the alleged conduct be "punishable under the laws of both parties"). Here, the parties agree that the relevant statute relating to the sexual abuse of a child charge is California Penal Code section 288, (<u>see</u> Def.'s Reply 4, ECF No. 18; United States' Reply 4, ECF No. 19), which provides in relevant part:

> (a) . . . [A] person who willfully and lewdly commits any lewd or lascivious act . . . upon or with the body, or any part or member thereof, of a child who is under the age of 14 years, with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child, is guilty of a felony and shall be punished by imprisonment in the state prison for three, six, or eight years.
>
> . . . .
>
> (c)(1) Any person who commits an act described in subdivision (a) with the intent described in that subdivision, and the victim is a child of 14 or 15 years, and that person is at least 10 years older than the child, is guilty of a public offense and shall be punished by imprisonment in the state prison for one, two, or three years, or by imprisonment in a county jail for not more than one year. In determining whether the person is at least 10 years older than the child, the difference in age shall be measured from the birth date of the person to the birth date of the child.

Cal. Penal Code § 288(a), (c)(1) (West 2014). Subdivision (c)(1) applies in this case as HH was fourteen years old on April 30, 2016, the date the crime was committed, and Velasquez Pedroza is more than ten years older than HH.[3] Under this statute, the alleged conduct is punishable in the United States by a maximum imprisonment of more than one year, as required by Article 1 of the Protocol and Annex.

---

[3] Velasquez Pedroza's date of birth is October 25, 1982. (Crim. Compl. 5, ECF No. 1.) HH's date of birth is December 26, 2001. (<u>Id.</u> Attach. #1 Ex. 1 [extradition req.], at 10.)

14

The parties also agree that the relevant statute relating to the rape charge is California Penal Code section 261.  (Def.'s Reply 5, ECF No. 18; United States' Reply 5, ECF No. 19.)  Under this provision:

> (a) Rape is an act of sexual intercourse accomplished with a person not the spouse of the perpetrator, under any of the following circumstances:
>
> . . . .
>
> (3) Where a person is prevented from resisting by any intoxicating or anesthetic substance, or any controlled substance, and this condition was known, or reasonably should have been known by the accused.
>
> (4) Where a person is at the time unconscious of the nature of the act, and this is known to the accused.  As used in this paragraph, "unconscious of the nature of the act" means incapable of resisting because the victim meets any one of the following conditions:
>
> (A) Was unconscious or asleep.
>
> (B) Was not aware, knowing, perceiving, or cognizant that the act occurred.
>
> (C) Was not aware, knowing, perceiving, or cognizant of the essential characteristics of the act due to the perpetrator's fraud in fact.

Cal. Penal Code § 261(a) (West 2014).  The punishment for rape under section 261 is imprisonment in the state prison for three, six, or eight years.  Id. § 264(a).

Therefore, because both crimes for which extradition is sought are "punishable under the laws of the requested and requesting States by deprivation of liberty for a maximum period of more than one year" as required by Article 1 of the Protocol and Annex, both offenses are covered under the treaty.

/ / /

/ / /

### a. Dual criminality

Velasquez Pedroza's sole argument in opposition to the request for extradition is that the United States has failed to show dual criminality. (Def.'s Reply 3-8, ECF No. 18.)

As set forth above, Article 1 of the Protocol and Annex to the 1976 Treaty provides, "An offense shall be an extraditable offense if it is punishable under the laws of the requested and requesting States by deprivation of liberty for a maximum period of more than one year or by a more severe penalty." (Crim. Compl. Attach. #1 Ex. 1 [treaty protocol], at 33, ECF No. 1.) The treaty thus contains a dual criminality requirement. (See id.; see also Liuksila v. Turner, 351 F. Supp. 3d 166, 174 (D.D.C. 2018).) "[U]nder the principle of dual criminality, no offense is extraditable unless it is criminal in both jurisdictions." Caplan v. Vokes, 649 F.2d 1336, 1343 (9th Cir. 1981) (internal quotations and citation omitted). "It is well established that all the principle of dual criminality requires is that the particular acts alleged constitute a crime in both jurisdictions." Emami, 834 F.2d at 1450 (citations omitted). "The name by which the crime is described in the two countries need not be the same, nor need the scope of the liability for the crimes be either coextensive or the same in both countries." Id. (citations omitted). Instead, "dual criminality exists if the 'essential character' of the acts criminalized by the law of each country are the same and if the laws are 'substantially analogous.'" Theron v. United States Marshal, 832 F.2d 492, 496 (9th Cir. 1987), abrogated on other grounds by United States v. Wells, 519 U.S. 482 (1997) (citations omitted).

As previously discussed, the Finnish crimes of sexual abuse of a minor and rape are most analogous to California Penal Code sections 288 (lewd and lascivious acts) [4] and 261 (rape) [5]. Velasquez Pedroza contends that because both of the California statutes

---

[4] California Penal Code section 288 is violated when a person "willfully and lewdly commits any lewd or lascivious act" upon the body of a child, "with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child . . . ." Cal. Penal Code § 288(a).

[5] Under California Penal Code section 261, rape occurs when the victim is preventing from resisting sexual intercourse "by any intoxicating or anesthetic substance . . . and this condition was known, or

incorporate a mens rea element, the Court must consider his alleged intent as part of the dual criminality analysis. (Def.'s Reply 4-6, ECF No. 18.) He argues that because the Finnish crimes do not contain a comparable mens rea component, the crimes are not extraditable under the treaty. (Id.)

Velasquez Pedroza relies on Manta v. Chertoff to support his argument. In Manta, the magistrate judge granted Greece's request for extradition on two foreign charges of fraud. Manta conceded that the foreign charges were similar to United States laws punishing mail and wire fraud but argued that the government had failed to prove dual criminality because it did not establish a "specific intent to defraud." Manta, 518 F.3d at 1142. The Ninth Circuit agreed with Manta that it was proper to consider her alleged intent as part of its dual criminality analysis and noted that dual criminality requires that the "conduct involved is *criminal* in both countries." Id. (internal quotations and citation omitted). The court framed the key inquiry as follows: "[W]e must consider whether Manta's alleged conduct evidences a specific intent to defraud such that her alleged conduct would be criminal in the United States." Id. The court concluded that Manta's intent to defraud was "easily infer[red]" from the alleged conduct giving rise to the two foreign fraud charges. Id.

Manta does not support Velasquez Pedroza's argument that the Finnish crimes of sexual abuse of a minor and rape are not extraditable crimes under the treaty. Velasquez Pedroza focuses on comparing the elements of the Finnish and California statutes, when the proper focus should be on his alleged conduct and whether it would be criminal in both countries. See, e.g., Clarey v. Gregg, 138 F.3d 764, 766 (9th Cir. 1998) ("The primary focus of dual criminality has always been on the conduct charged; the elements of the analogous offenses need not be identical."). Here, Finland's sexual abuse of a minor statute and California's law against lewd and lascivious acts punish the conduct with which Velasquez Pedroza is charged—touching a child in a sexual manner. The

reasonably should have been known by the accused" or when the victim is "unconscious of the nature of the act, and this is known to the accused." Cal. Penal Code § 261(a)(3), (4).

laws are analogous because they both punish crimes of the same general character.  See United States v. Knotek, 925 F.3d 1118, 1131-32 (9th Cir. 2019) ("It is immaterial whether one country's law is broader than the other, so long as the 'essential character of the acts criminalized is the same.'") (citations omitted).  The Protocol to the Extradition Treaty Between the United States and Finland underscores that the elements of an extraditable offense under Finnish law need not be identical to those under California law.  "[A]n offense shall be considered an extraditable offense . . . regardless of whether the laws in the requesting and requested State place the offense within the same category of offenses or describe the offense by the same terminology . . . ."  (See Crim. Compl. Attach. #1 Ex. 1 [treaty protocol], at 35, ECF No. 1.)  Similarly, the Finnish crime of rape and the California rape statute both punish sexual intercourse with a person who is unable to prevent the act due to unconsciousness.  "[W]hen the laws of both the requesting and the requested party appear to be directed to the same basic evil, the statutes are substantially analogous, and can form the basis for dual criminality."  Clarey, 138 F.3d at 766 (internal quotations and citations omitted).

Moreover, the cases cited by Velasquez Pedroza to support his argument that the Court must consider a defendant's intent permit the court to infer intent from the defendant's conduct.  See Manta, 518 F.3d at 1142 ("[I]ntent . . . may be inferred from circumstantial evidence.") (citing cases); see also People v. Martinez, 11 Cal. 4th 434, 445, 903 P.2d 1037, 1043, 45 Cal. Rptr. 2d 905, 911 (1995) (reiterating that the trier of fact "looks to all circumstances, including the charged act, to determine whether it was performed with the required specific intent[]") (citations omitted).  Here, with respect to the sexual abuse of a minor charge, the extradition request alleges that Velasquez Pedroza offered HH red wine, told her he was nineteen years old, grabbed her head, kissed her on the mouth with his tongue, and fondled her breasts and buttocks.  (See Crim. Compl. Attach. #1 Ex. 1 [extradition req.], at 10, ECF No. 1.)  The Court can infer that Velasquez Pedroza acted "with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires" of himself or HH as required under California Penal Code section 288.

See Cal. Penal Code § 288. As to the rape charge, Korpela reported that after an evening of drinking, she woke up completely naked on the floor of a restaurant that she did not recall going to, and that a man subsequently identified as Velasquez Pedroza told her that they had had sex, which she had no recollection of. (See Crim. Compl. Attach. #1 Ex. 1 [extradition req.], at 11, ECF No. 1.) Under these circumstances, the Court can infer that Velasquez Pedroza knew or should have known that Korpela was intoxicated or unconscious at the time intercourse occurred and thus was incapable of resisting, in violation of California Penal Code section 261. In both instances, Velasquez Pedroza's alleged conduct evidences the requisite intent under the California statutes and would be criminal in the United States, satisfying the dual criminality requirement.

Velasquez Pedroza's contention that the offenses are "wobblers" under California state law and therefore non-extraditable also fails. In California, a "wobbler" statute "is presumptively a felony and remains a felony except when the discretion is actually exercised to make the crime a misdemeanor." United States v. Denton, 611 F.3d 646, 651 (9th Cir. 2010) (internal quotations and citation omitted). In making this argument, Velasquez Pedroza mistakenly relies on the text of Article 2 of the 1976 Treaty, which he interprets as permitting extradition only for felony offenses. (Def.'s Reply 6-7, ECF No. 18.) Article 2 of the 1976 Treaty, however, was replaced by Article 1 of the Protocol and Annex. (Crim. Compl. Attach. #1 Ex. 1 [treaty protocol], at 35, ECF No. 1.) Article 1 permits extradition for offenses that are "punishable under the laws of the requested and requesting States by deprivation of liberty for a maximum period of more than one year." Both analogous offenses under California state law meet this criterion. It is thus of no consequence whether the offenses are considered "wobblers" under California state law.

In his supplemental brief, Velasquez Pedroza provides additional argument and citations to case authority regarding dual criminality. (Def.'s Supp. Br. 3-7, ECF No. 21.) None of the cases he cites, however, support his argument that the Finnish and California statutes are not substantially analogous. United States v. Khan, 993 F.2d 1368 (9th Cir. 1993), does not, as Velasquez Pedroza contends, require that "the defendant's criminal

intent match in the laws of both jurisdictions." (See Def.'s Supp. Br. 4, ECF No. 21.) Rather, the defendant must be able to be charged and punished in both jurisdictions for the conduct underlying the charges. Khan, 993 F.2d at 1373. In Kahn, the Ninth Circuit found that dual criminality did not exist for one of the counts against the defendant because Pakistan did not have a law sufficiently analogous to the law in the United States that prohibits the use of a telephone to facilitate the commission of a drug felony. Id. Conversely, in this case, Velasquez Pedroza's alleged conduct can be charged and punished in the United States (under California Penal Code sections 261 and 288) and Finland (under Sections 1 and 6 of the Criminal Code); thus, the statutes are substantially analogous. In Peters, 888 F.2d at 719, the Tenth Circuit explained that statutes are "substantially analogous when they 'punish conduct falling within the broad scope' of the same 'generally recognized crime.'" Id. Both the Finnish and California statutes criminalize touching a child in a sexual manner and sexual intercourse with a person who is unable to prevent the act due to unconsciousness, and thus meet the standard set forth in Peters. Shapiro v. Ferrandina, 478 F.2d 894 (2nd Cir. 1973), addressed the "principle of specialty," which provides that the requesting state may not try or punish the fugitive for crimes other than the crimes for which he was extradited. Id. at 905. The Second Circuit expressed concern that "multiple characterizations of the acts charged [could] raise potential problems of increased punishment through successive sentences" and thus examined the extraditability of each of the offenses charged as well the acts on which each charged offense was based. Id. at 908. Shapiro is inapplicable here.

Velasquez Pedroza continues to focus on comparing the elements of the Finnish and California statutes, when the proper focus should be on his alleged conduct and whether it would be criminal in both countries. See, e.g., Clarey, 138 F.3d at 766. Velasquez Pedroza's alleged conduct is criminal in both Finland and the United States. The Court accordingly finds that dual criminality is satisfied.

/ / /

/ / /

## C. **Probable Cause**

In an extradition proceeding, the central function of the magistrate judge is to determine whether there is competent evidence to justify holding the accused to await trial in the requesting state, not to determine whether the evidence is sufficient to justify a conviction. Collins v. Loisel, 259 U.S. 309, 316 (1922); Hooker, 573 F.2d at 1367. "The extradition proceeding . . . makes no determination of guilt or innocence." Valencia v. Limbs, 655 F.2d 195, 198 (9th Cir. 1981). "It is designed only to trigger the start of criminal proceedings against an accused; guilt remains to be determined in the courts of the demanding country." Id. (citations omitted). Probable cause exists when there is "evidence sufficient to sustain the charge under the provisions of the proper treaty or convention." Vo, 447 F.3d at 1237 (citing 18 U.S.C. § 3184). "Because the [magistrate judge's] probable cause finding is thus not a finding of fact in the sense that the court has weighed the evidence and resolved disputed factual issues, it must be upheld if there is any competent evidence in the record to support it." Quinn, 783 F.2d at 791 (internal quotations and citations omitted). Thus, inconsistencies in witness statements do not preclude a finding of probable cause, where competent evidence in the record supports a reasonable belief of the accused's guilt. Sainez v. Venables, 588 F.3d 713, 718 (9th Cir. 2009); see also Shapiro, 478 F.2d at 905 (upholding judge's refusal to examine credibility of testimony and statements in translated material as the declarants were not before the judge); Bovio v. United States, 989 F.2d 255, 259 (7th Cir. 1993) (stating "issues of credibility are to be determined at trial," not at the extradition hearing).

"Competent evidence to establish reasonable grounds [to believe the accused guilty] is not necessarily evidence competent to convict." Fernandez v. Phillips, 268 U.S. 311, 312 (1925). If the magistrate judge finds probable cause to sustain the charge, he or she "is required to certify the individual as extraditable to the Secretary of State." Blaxland, 323 F.3d at 1208.

/ / /

/ / /

### 1. Admissibility of evidence

The Ninth Circuit has indicated that "[t]he usual rules of evidence do not apply in extradition hearings and, unless the relevant treaty provides otherwise, the only requirement for evidence is that it has been authenticated." Manta, 518 F.3d at 1146 (citation omitted); see also Fed. R. Evid. 1101(d)(3) (stating that Federal Rules of Evidence do not apply to extradition or rendition proceedings); Fed. R. Crim. P. 1(a)(5) (extradition proceedings not covered by Federal Rules of Criminal Procedure). "[A]uthentication is the only requirement for admissibility of evidence under general United States extradition law." Oen Yin-Choy, 858 F.2d at 1406; see also Zanazanian v. United States, 729 F.2d 624, 627 (9th Cir. 1984). The Supreme Court has found that extradition may be predicated entirely on the "unsworn statements of absent witnesses." Collins, 259 U.S. at 317. Indeed, both sworn and unsworn statements contained in properly authenticated documents are permissible. Artukovic v. Rison, 784 F.2d 1354, 1356 (9th Cir. 1986). Additionally, hearsay evidence is permitted in extradition proceedings. Then v. Melendez, 92 F.3d 851, 855 (9th Cir. 1996). This includes multiple hearsay. See Zanazanian, 729 F.2d at 627 (permitting police report describing a witness statement); Escobedo v. United States, 623 F.2d 1098, 1102 (5th Cir. 1980) (permitting written third-party account of deposition testimony).

Here, the documentary evidence submitted by the United States on behalf of Finland was properly authenticated under the terms of the 1976 Treaty, as amended by the Protocol and Article 2 of the Annex. (See Crim. Compl. Attach. #1 Ex. 1 [Liadis Decl.], at 6, ECF No. 1; see also id. [treaty protocol], at 36 (providing that documents that bear the certificate or seal of the Finnish Ministry of Justice are admissible in extradition proceedings without further certification, authentication, or other legalization).) Velasquez Pedroza has not presented any argument or evidence to the contrary. Therefore, under the general extradition law of the United States and the provisions of the treaty, all of the documents submitted on behalf of Finland are admissible for purposes of this extradition proceeding.

## 2. Identity

"At an extradition hearing, the court is required to determine whether the party before the court is the party named in the extradition complaint." Manta, 518 F.3d at 1143 (citation omitted). "Whether the person before the court is the accused is part of the magistrate judge's probable cause analysis." Id. (citation omitted). There must be "competent evidence" of identity. Id. "[T]he credibility of the reported identification is a matter committed to the magistrate [judge.]" Id. at 1145 (citations omitted). "[T]here is no *per se* rule that specifies which identification procedures are competent for probable cause purposes." Quinn, 783 F.2d at 815. "An identification based on a single photograph may be competent evidence of identity in an extradition proceeding." Manta, 518 F.3d at 1145 (citation omitted).

Velasquez Pedroza (i.e., the person named in the extradition request) is described as a citizen of Guatemala with a date of birth of October 25, 1982 (age 37). (See Crim. Compl. 5, ECF No. 1.) The documentary evidence includes a photograph, allegedly of Velasquez Pedroza. (See id. Attach. #1, Ex. 1 [photo], at 46.) According to the description of facts provided by the Helsinki Prosecutor's Office, each of the victims identified Velasquez Pedroza by photograph as the perpetrator of the respective crime committed against her. (See id. [extradition req.], at 10, 12.) At the January 21, 2020 extradition hearing and previously, the person appearing before the Court acknowledged, through his counsel, that his name is Velasquez Pedroza. (See Hr'g Tr. 2, Dec. 3, 2019, ECF No. 23.) He disclosed, as part of his opposition to the extradition request, that he has filed an asylum claim in order to avoid being deported to Guatemala. (Id.; see also Def.'s Supp. Br. 7, ECF No. 21 (describing Guatemala as Velasquez Pedroza's "home country").) He does not contest identity.

There is probable cause to believe that the person appearing before this Court is the person named in the request for extradition and accompanying documents.

/ / /

/ / /

### 3. Sexual abuse of a child charge

The crime of sexual abuse of a child is defined by Finnish Criminal Code Chapter 20, Section 1. A person violates this act "by touching or otherwise perform[ing] a sexual act on a child below the age of sixteen years, said act being conducive to impairing his or her development, or induc[ing] him or her to perform such an act." (Crim. Compl. Attach. #1 Ex. 1 [statutes], at 59, ECF No. 1.) The documents supplied by Finland are sufficient to support a finding of probable cause that Velasquez Pedroza committed the crime of sexual abuse of a child against HH, a minor. Bearing in mind that issues of credibility are to be determined at trial, not at the extradition hearing, (see, e.g., Bovio, 989 F.2d at 259), the Court finds that HH's statements about the incident and subsequent identification of Velasquez Pedroza in a photograph as the perpetrator constitute competent evidence demonstrating probable cause that Velasquez Pedroza touched her in a sexual manner. (See Crim. Compl. Attach. #1 Ex. 1 [extradition req.], at 10, ECF No. 1.) Although he denied any involvement with HH, Velasquez Pedroza admitted being at the park, the location of the sexual abuse, on the night in question. (Id.) The perpetrator provided HH with a cell phone number, which was identified as Velasquez Pedroza's, and the identification of Velasquez Pedroza as the suspect was also apparently corroborated by the photograph of the perpetrator that HH took on her cell phone. (Id.) The Court finds probable cause for this charge.

### 4. Rape charge

Chapter 20, Section 6 of the Finnish Criminal Code punishes a person for rape when he has sexual intercourse with another person by "taking advantage of the fact that [the other] person, due to unconsciousness . . . is unable to defend . . . herself or to formulate or express . . . her will . . . ." (Id. [statutes], at 59.) The information provided by Finland is sufficient to support a finding of probable cause that Velasquez Pedroza committed the crime of rape against Susanna Korpela. Korpela alleges she was raped by a man she did not know while she was intoxicated or unconscious. (Id. [extradition req.], at 11.) The man told her, when she awoke, that they had had sex. (Id.) She underwent a

sexual assault forensic examination during which samples of her vaginal fluid were taken.  (Id. [forensic exam], at 47-48.)  These samples were compared to the chromosome type of Velasquez Pedroza, who provided a DNA sample when questioned by police in relation to HH's sexual abuse allegation.  (Crim. Compl. 3, ECF No. 1; Id., Attach. #1 Ex. 1 [DNA analysis], at 53.)  The Y chromosome type obtained from Korpela's forensic sample matched the Y chromosome type of Velasquez Pedroza.  (Id.)  His Y chromosome type corresponds to 0.6% of the Finnish male population.  (Id.)  Additionally, three What's App messages were sent from Velasquez Pedroza's cell phone number to Korpela's phone following the rape.  (Id. [extradition req.], at 11.)  Velasquez Pedroza worked at the Helsinki University Cafe, located in the same vicinity as the restaurant where the rape occurred.  (Id. at 12.)  The evidence is sufficient to establish probable cause that Velasquez Pedroza raped Korpela.  See Valencia, 655 F.2d at 198 (emphasizing that an extradition proceeding "is designed only to trigger the start of criminal proceedings against an accused; guilt remains to be determined in the courts of the demanding country").

## IV.    FINDINGS AND CERTIFICATION

The Court makes the following findings:  (1) There is a valid extradition treaty between the United States and Finland; (2) Velasquez Pedroza has been charged in Finland with one count of sexual abuse of a child and one count of rape; (3) these charges constitute extraditable offenses within the meaning of the extradition treaty between the United States and Finland; and (4) there is probable cause to believe that Velasquez Pedroza, the fugitive and the same person who is before this Court, committed the offenses for which his extradition is sought.  The required documents have been presented in accordance with the laws of the United States and the applicable treaty and have been properly authenticated.

Based on the foregoing findings, the Court concludes that Velasquez Pedroza is extraditable for the offenses for which extradition is requested.  This matter is certified to the Secretary of State, together with a copy of the exhibits and all argument before the

19mj1696-RBB

Court in order that a warrant may issue upon the request of the proper authorities of Finland for the surrender of Velasquez Pedroza, according to the provisions of the treaty between the United States and Finland.

It is ordered that Velasquez Pedroza is committed to the custody of the United States Marshal, or his authorized representative, pending final disposition of this matter by the Secretary of State and surrender to Finland.

Dated:  February 4, 2020

Hon. Ruben B. Brooks
United States Magistrate Judge

19mj1696-RBB